**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

|  |  |
|---|---|
| **CENTRALSQUARE TECHNOLOGIES, LLC,** | |
| *Plaintiff and Counterclaim-Defendant*, | Civil Action No. 1:24-cv-01497-ADA |
| v. | **JURY TRIAL DEMANDED** |
| **CARBYNE, INC., and CARBYNE LTD.,** | |
| *Defendants and Counterclaim-Plaintiffs*. | |

**CARBYNE'S OPENING CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS

**Page(s)**

I.     INTRODUCTION ..................................................................................................1

II.    OVERVIEW OF THE '016 PATENT ..................................................................1

III.   THE LEVEL OF ORDINARY SKILL IN THE ART .........................................2

IV.    LEGAL STANDARDS .........................................................................................2

     A.     Claim Construction ...................................................................................2

     B.     Indefiniteness ............................................................................................3

     C.     "Means-Plus-Function" Limitations Under Section 112(f) ......................4

V.     DISPUTED CLAIM TERMS ...............................................................................4

     A.     "user-selectable options" ('016 Patent, Claims 1, 2, 9, 10, 17) .............4

     B.     "a call reception module configured to…" / "an outgoing message module
            configured to …" / "a transmission module configured to…" / "a presentation
            module configured to …" / "a web-hosting module configured to …" ('016
            Patent, Claim 1) .......................................................................................6

           1.     The "Module" Limitations Are Indefinite Means-Plus-Function Terms that
                    Lack Corresponding Structure. ...................................................7

           2.     §112(f) Applies to the Challenged "Module" Limitations. ........................8

           3.     The '016 Specification Does Not Disclose Sufficient Corresponding
                    Structure. .....................................................................................12

     C.     "[sharing] … received location information with the user interface" /
            "[presenting] shared queried location information to emergency operators through
            the user interface." ('016 Patent, Claim 9) .........................................18

VI.    CONCLUSION ....................................................................................................20

## I.      INTRODUCTION

Carbyne, Inc. and Carbyne Ltd. (collectively, "Carbyne") submits this opening claim construction brief regarding the proper construction of disputed terms appearing in the claims of U.S. Patent No. RE50,016 ("the '016 patent"), which CentralSquare asserts against Carbyne.

## II.     OVERVIEW OF THE '016 PATENT

The '016 patent is entitled "SMS Communication during Emergencies" and is directed to a system for operators at an emergency call center to send textual messages to mobile devices which place a call to the call center.[1] The patent explains that "[c]onventionally, emergency phone calls are answered by an emergency call center, such as *e.g.*, a public safety answering point (PSAP)." *Id.*, 1:28-30. An "operator" at this call center—"also referred to as dispatchers"—"may … attempt to gather information" from the caller verbally, including "the name of the caller," "nature of the emergency," "the location of the emergency" and so on. *Id.*, 1:30-36.

In contrast to voice-only systems, the '016 patent "provid[es], to emergency operators, communication through textual messages with callers using wireless mobile devices." *Id.*, 1:23-25. Communication may occur via "emergency communication networks, wired telephone networks, wireless telephone networks, cellular networks, the internet, and/or one or more other … networks." *Id.*, 1:62-67. "Users may access the system via landlines, wired telephones, wireless telephones, smartphones, mobile devices" or the like. *Id.*, 2:9-17. Client devices can send and receive "textual messages" like SMS or MMS messages, "access Internet addresses" or "URL addresses," and "obtain[] … global positioning system (GPS) information." *Id.*, 2:17-24, 3:18-37.

In operation, incoming calls are received by a "call reception module." *Id.*, 2:46-49. A "presentation module" "present[s] incoming emergency voice calls to emergency operators" and

---

[1] Appendix 1, filed herewith, includes a listing of the independent claims of the '016 Patent.

includes a "user interface" with various "user-selectable options." *Id.*, 4:6-20. An "outgoing message module" generates "outgoing messages for transmission to telephones and/or devices." *Id.*, 6:26-29. Outgoing messages are "transmit[ed]" to callers using a "transmission module." *Id.*, 3:63-66. "[A] caller may provide requested information by replying to the outgoing textual message transmitted by the system…." *Id.*, 6:46-48. A "web-hosting module" allows the system to "query devices (including but not limited to wireless mobile devices) for geolocation information." *Id.*, 4:28-35; *see also* Fig. 1. The claims, in essence, recite various computer program modules configured to perform the various claimed functions of the system.

## III.    THE LEVEL OF ORDINARY SKILL IN THE ART

A POSITA in the field of the '016 patent would have had a degree in computer science or computer engineering, along with 2 years of professional experience working with telecommunications systems, or an equivalent level of skill, knowledge, and experience. Declaration of Gerry Christensen ("Christensen"), ¶ 21.[2] More formal education may require less experience to attain an ordinary level of skill. *Id.* Similarly, more experience may serve as a substitute for formal education. *Id.* This POSITA would have been aware of and generally knowledgeable about the standard features and functionality of emergency calling, geolocation, and text messaging systems. *Id.*

## IV.    LEGAL STANDARDS

### A.    Claim Construction

Claim construction is a legal question that "begins and ends . . . with the actual words of the claim." *Homeland Housewares, LLC* v. *Whirlpool Corp.*, 865 F.3d 1372, 1375 (Fed. Cir. 2017) (citation omitted). Although courts generally give claim terms plain and ordinary meaning, which

---

[2] Gerald Christensen is an expert in the field of telecommunication systems, among other fields. Mr. Christensen's declaration is filed herewith.

is "the meaning that the term would have to a [POSITA] . . . at the time of the invention" (*Phillips*

v. *AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc)), courts will depart from the plain

and ordinary meaning of a claim term in two circumstances: (i) when the patentee "acts as his own

lexicographer," *i.e.*, redefines a claim term; or (ii) when the patentee "disavows the full scope of

the claim term in the specification or during prosecution." *Poly-Am., L.P.* v. *API Indus., Inc.*, 839

F.3d 1131, 1136 (Fed. Cir. 2016). A patentee is his own lexicographer when he "clearly express[es]

an intent" to use "a definition of the disputed claim term other than its plain and ordinary meaning."

*Kyocera Senco Indus. Tools Inc.* v. *Int'l Trade Comm'n*, 22 F.4th 1369, 1378 (Fed. Cir. 2022)

(citation omitted). Disavowal arises from evidence "that the claimed invention . . . does not include

a particular feature." *Poly-Am.*, 839 F.3d at 1136. But while the evidence must be "clear," "explicit

redefinition or disavowal" is not required. *Trs. of Columbia Univ.* v. *Symantec Corp.*, 811 F.3d

1359, 1363 (Fed. Cir. 2016). Instead, disavowal "may be inferred from clear limiting descriptions

of the invention in the specification or prosecution history." *Id*. (citation omitted).

### B.    Indefiniteness

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification

delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those

skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572

U.S. 898, 901 (2014). "The definiteness requirement, so understood, mandates clarity" as to the

scope of the claim. *Id*. at 910. Indefiniteness must be proven by clear and convincing evidence.

*BASF Corp. v. Johnson Matthey Inc*., 875 F.3d 1360, 1365 (Fed. Cir. 2017). A claim is indefinite

when it contains words or phrases where the meaning is unclear, which may be the result of the

lack of an antecedent basis. *In re Packard*, 751 F.3d 1307, 1310, 1314 (Fed. Cir. 2014).

### C.    "Means-Plus-Function" Limitations Under Section 112(f)

An inventor may elect to express a claim limitation as "means plus function" under 35 U.S.C. § 112(f) (§ 112, ¶ 6, pre-AIA). Means-plus-function limitations are interpreted to cover the corresponding structure described in the specification and equivalents thereof. *Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1365 (Fed. Cir. 2022). Either the specification or prosecution history must "clearly link or associate" that structure to the function. *Twin Peaks Software Inc. v. IBM Corp.*, 690 Fed App'x 656, 664 (Fed. Cir. May 26, 2017). Use of the word "means" in a claim limitation "creates a rebuttal presumption that § 112, ¶ 6 applies." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015). "Construing a means-plus-function claim term is a two-step process. The court must first identify the claimed function. Then, the court must determine what structure, if any, disclosed in the specification corresponds to the claimed function." *Id.* at 1351. If a patentee fails to disclose adequate corresponding structure, the claim is indefinite. *Id.* at 1352.

## V.    DISPUTED CLAIM TERMS

### A.    "user-selectable options" ('016 Patent, Claims 1, 2, 9, 10, 17)

| Carbyne's Construction | CentralSquare's Construction |
|---|---|
| Plain and ordinary meaning; distinct from "action button(s)" | Plain and ordinary meaning. |

The parties agree that the term "user-selectable options" should be construed in accordance with its plain and ordinary meaning, but dispute whether the term "user-selectable options" must be construed to be distinct from "action button(s)." Because the specification clearly differentiates "user-selectable options" from "action buttons," the plain and ordinary meaning cannot include "action buttons." *See, e.g., Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.,* 533 F.3d 1362, 1371 (Fed. Cir. 2008) ("Different claim terms are presumed to have different meanings").

The '016 patent recites a "user interface" that "includes a set of user-selectable options."

*See*, *e.g.*, '016 Patent, Cls. 1, 9. The '016 patent's specification clearly distinguishes the recited "user-selectable options" from "action button(s)." The '016 patent's specification explains that "[u]ser interface 601 of FIG. 6 may include interface elements 602 and 603, informational element 605, [and] action button 604" among other things:



'016 Patent, Fig. 6, 8:38-41. The '016 further explains that it is "**[i]nterface elements 602 and 603 [that] may, e.g., be** an object, interface, and/or other items that a user may interact with, such as **a menu of user-selectable options**." '016 Patent, 8:41-45 (emphasis added); *see also* 8:45-67. That is, interface elements 602 and 603 may be the recited "user-selectable options" while "action button 604" is a distinct (and *different*) element of the user interface as shown in Fig. 6. *Board of Regents*, 533 F.3d at 1362. A user-selectable option may be, for example, "a set of different types of emergency" such as a car accident, "a set of informational requests," "whether any passengers appear to be stuck or hurt, instructions for providing first-aid to a passenger thrown clear from a car, [or] a request for the current caller to provide geolocation information." '016 Patent, 8:47-58. By contrast, "[a]ction button 604, upon activation by the emergency operator, may effect transmission of the generated outgoing textual message." '016 Patent, 8:64-67. *ERBE Elektromedizin GmbH v. International Trade Com'n,* 566 F.3d 1028 (Fed. Cir. 2009) is instructive.

In *ERBE*, the claim term "working channel" was construed to require that an instrument or device could be placed in the channel and then used to perform a task. *Id*. at 1033-34. The Federal Circuit in *ERBE* rejected the patentee's proposed construction on appeal of "working channels" as applying to a channel with fixed embedded optics since that construction was clearly inconsistent with two patent drawings and the specification, which identified a channel with the fixed optics as being an "optical lens" while specifically identifying two other channels as "working channels." *Id*. at 1034-37. The court further noted that nowhere did the specification refer to the fixed optics as being a "working channel." *Id*. "User-selectable options" is similar: the specification and figures both show "action buttons" as distinct from "user-selectable options," and nowhere does the specification refer to an "action button" as a "user-selectable option." Accordingly, the Court should construe "user-selectable options" as distinct from "action button(s)."

**B.    "a call reception module configured to…" / "an outgoing message module configured to …" / "a transmission module configured to…" / "a presentation module configured to …" / "a web-hosting module configured to …" ('016 Patent, Claim 1)**

| Carbyne's Construction[3] | CentralSquare's Construction |
|---|---|
| Subject to § 112(f)<br><br>Call Reception Module Function: receive incoming emergency voice calls being placed to an emergency call center through an emergency communications network from wireless mobile devices, the incoming emergency voice calls including a first voice call placed from a first wireless mobile device<br><br>Outgoing Message Module Function: generate outgoing textual messages for transmission to wireless mobile devices from which incoming emergency voice calls are received such that a first outgoing textual message is generated for transmission to the first wireless mobile device based on the first voice call | Plain and ordinary meaning. |

---

[3] For the sake of brevity, Carbyne focuses only on four of the claimed module functions here. The fifth, the "presentation module," also lacks corresponding structure.

| |
|---|
| <u>Transmission Module Function</u>: transmit the outgoing textual messages to the wireless mobile devices through a second communications network that is different than the emergency communications network such that the first outgoing textual message is transmitted to the first wireless mobile device through the second communications network<br><br><u>Web-Hosting Module Function</u>: host web resources configured to query wireless mobile devices for location information; and share, responsive to receipt of location information, received location information with the presentation module<br><br><u>Structure</u>: None. Indefinite. |

**1.    The "Module" Limitations Are Indefinite Means-Plus-Function Terms that Lack Corresponding Structure.**

Under 35 U.S.C. § 112(f) (previously known as 35 U.S.C. § 112, ¶ 6), a patentee may draft claims "as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof." However, if a patentee fails in the specification to disclose adequate corresponding structure, the claim is indefinite. *Williamson*, 792 F.3d at 1352. The analysis of such means-plus-function claims thus ***first*** asks whether the disputed term is in fact a means-plus-function term. *Rain Computing, Inc. v. Samsung Elecs. Am., Inc.*, 989 F.3d 1002, 1006 (Fed. Cir. 2021). If so, the ***second*** step is to construe the claim, which itself is a two-part analysis: (i) "identify the claimed function" *Williamson*, 792 F.3d at 1351; and (ii) "determine what structure, if any, disclosed in the specification corresponds to the claimed function," *id*.

Here, Claim 1 recites the following "modules" configured to perform claimed functions:

| |
|---|
| **call reception module** configured to <u>receive incoming emergency voice calls being placed to an emergency call center through an emergency communications network from wireless mobile devices, the incoming emergency voice calls including a first voice call placed from a first wireless mobile device</u> |
| **outgoing message module** configured to <u>generate outgoing textual messages for transmission to wireless mobile devices from which incoming emergency voice calls are received such that a first outgoing textual message is generated for transmission to the first wireless mobile device based on the first voice call</u> |
| **transmission module** configured to <u>transmit the outgoing textual messages to the appropriate wireless mobile devices through a second communications network that is different than the emergency communications network such that the first outgoing textual</u> |

| |
|---|
| message is transmitted to the first wireless mobile device through the second communications network |
| **presentation module** configured to present incoming emergency voice calls to emergency operators through a user interface, wherein the user interface includes a set of user-selectable options, and wherein the presentation module is further configured to receive user input from emergency operators to select one or more of the set of user-selectable options |
| **web-hosting module** configured to host web resources configured to: (i) query wireless mobile devices for location information; and (ii) share, responsive to receipt of location information, received location information with the presentation module |

These nonce terms are subject to § 112(f) because the asserted claims exclusively describe each module's function—not its structure. Because the '016 patent's specification fails to disclose corresponding structure to carry out each module's recited function, these claims in which these limitations appear are indefinite. *Williamson*, 792 F.3d at 1352.

### 2. §112(f) Applies to the Challenged "Module" Limitations.

Each recited "module" is a means-plus-function term. Though absence of the word "means" creates a rebuttable presumption that a term is not a means-plus-function limitation, Section 112(f) nevertheless applies when the claim term: (i) "fails to recite sufficiently definite structure," or (ii) "recites function without reciting sufficient structure for performing that function." *Id*. at 1349; *see also TriMed, Inc. v. Stryker Corp*., 514 F.3d 1256, 1259-60, 85 USPQ2d 1787, 1789 (Fed. Cir. 2008) ("Sufficient structure exists **when the claim language specifies the exact structure that performs the function in question** without need to resort to other portions of the specification or extrinsic evidence for an adequate understanding of the structure.") (emphasis added). Importantly, "[t]he question is not whether a claim term recites any structure but whether it recites sufficient structure—a claim term is subject to § 112(f) if it recites function without *reciting sufficient structure* for performing that function." *Egenera, Inc. v. Cisco Sys., Inc.*, 972 F.3d 1367, 1374 (Fed. Cir. 2020).

Claim 1's formulaic reference to "call reception," "outgoing message," "transmission," "presentation," and "web-hosting" as a prefix to each "module" term does not connote sufficient

structure to avoid means-plus-function treatment.[4] In each case, the prefix to "module" (*i.e.*, "call reception," "outgoing message," "transmission," and "web-hosting")fails to impart structure because it merely describes the basic function of the module: to receive a call, to generate an outgoing message, transmit data, present data, and host data on the web. *See, e.g., Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1372 (Fed. Cir. 2015) (applying Section 112, ¶ 6 because "the claims simply state that the 'compliance mechanism' can perform various functions"). That is, by simply reformulating or restating the claimed functionality, the claim language fails to provide any actual ***structure*** for performing the claimed functions. *Chicago Bd. Options Exchange, Inc. v. International Securities Exchange, LLC*, 677 F.3d 1361, 1367 n.1 (Fed. Cir. 2012) ("the claim language fails to sufficiently recite the corresponding structure of 'system memory means.' In particular, the limitation articulates a function, but nowhere in the language of the limitation is there a specific and definite structure of a 'system memory means.' As a result, this limitation as drafted does not aid a skilled artisan in ascertaining its corresponding structure because no such structure is sufficiently recited."). Christensen, ¶¶ 23-24. This means each recited "module" is a means-plus-function term.

*Optis Cellular Technology, LLC v. Apple Inc.*, 139 F.4th 1363, 1382–83 (Fed. Cir. 2025) is a useful comparison. In *Optis*, the Federal Circuit reversed a finding that "a selecting unit configured to randomly select a sequence"[5] was not subject to § 112(f). *Id*. The Federal Circuit

---

[4] It is also worth pointing out that the term "module" is a well-known nonce word that is consistently held to operate as "a substitute for 'means'" for purposes of ¶ 112(f). *Williamson*, 792 F.3d at 1350.

[5] The full limitation included a lengthy recitation of claimed functionality, as here: "a selecting unit configured to randomly select a sequence from a plurality of sequences contained in one group of a plurality of groups, into which a predetermined number of sequences that are generated from a plurality of base sequences are grouped and which are respectively associated with different amounts of data or reception qualities, wherein the predetermined number of sequences are

9

explained that the district court had erroneously listed the functions of "selecting unit," and this was insufficient to "specify any structure showing how 'selecting unit' operates," and while the claim may have recited some input and outputs of the unit at a high level, "the claim does not describe how 'selecting unit' 'interacts with other components … in a way that might inform the structural character of the limitation-in-question or otherwise impart structure to [selecting unit].'" *Id*. at 1382. For the same reason explained above for the word "module" above, the court held that "the word 'unit' does not sufficiently connote structure and is similar to other terms that we have held to be nonce terms similar to 'means' and invoke § 112 ¶ 6." *Id*. (citing *MTD Prods. Inc. v. Iancu*, 933 F.3d 1336, 1341 (Fed. Cir. 2019) ('Generic terms like '***module***,' 'mechanism,' 'element,' and 'device' are commonly used as verbal constructs that operate, like 'means,' to claim a particular function rather than describe a 'sufficiently definite structure.")) (emphasis added).

During prosecution, the Examiner found § 112(f) applied to the limitations here. Declaration of Evan Brewer ("Brewer Decl.,"), Ex. A, at 3-11 (Jan. 24, 2024 Non-Final Rejection). The Examiner concluded that the "module" limitations "do not convey any particular structure" and to a POSITA "do not denote particular structure either expressly or inherently." *Id.* at 7.[6] In response, the Applicant argued that these "module" terms themselves "connote[] a class of structures to a person of ordinary skill because the indicated Phrases are computer program that

_____

grouped by partitioning the predetermined number of sequences, in which sequences generated from the same base sequence and having different cyclic shifts are arranged in an increasing order of the cyclic shifts." *Optis*, 139 F.4th at 1383.

[6] The Examiner eventually allowed the claims, finding that "the argument about the interpretation of claims under 35 U.S.C. 112(f) is moot" (Brewer Decl., Ex. C, at 3 (April 22, 2024 Notice of Allowance, at 3)) because, regardless of whether the claims included means-plus-function terms, the Examiner believed the specification disclosed sufficient corresponding structure. Brewer Decl., Ex. A, 11. However, the Examiner merely cited half the specification as corresponding structure, without any explanation or analysis. *Id*. As explained below, the specification does not disclose sufficient corresponding structure.

can be executed by one or more processors as recited in claim 1." Brewer Decl., Ex. B, at internal page no. 16 (March 19, 2024 Remarks in Amendment, at 16). Specifically, Applicant asserted, "claim 1 recites 'one or more processors configured to execute computer program modules, the computer program modules compris[e]' each of the indicated Phrases." *Id*. But applicants cannot simply combine "two nonce words—'processor' and '[module]—together in order to essentially write the claim in a means-plus-function format without being subject to § 112, ¶ 6." *Dyfan, LLC v. Target Corp.*, 6:19-cv-179-ADA, Dkt. 57 at 20 & n.4 (W.D. Tex. 2020). The same is true here. Adding "processors" to execute a "module" does not add or connote any meaningful structure. Requiring "processors" indicates only that the claim contemplates software, but no particular structural specificity at all, let alone what structure(s) actually implements the claimed functions. The specification confirms that "processors" are black-box placeholders requiring specific (undisclosed) algorithms to perform the cited functions. *See, e.g.*, 12:4-26; 12:20-26 ("Processor 110 may be configured to execute modules 32-40, and/or other modules by software; hardware; firmware; some combination of software, hardware, and/or firmware; and/or other mechanisms for configuring processing capabilities on processor(s) 110."); Christensen, ¶¶ 23-24.

Applicant's argument that the "module" terms somehow "connote[] a class of structures to a person of ordinary skill because the indicated Phrases are computer program that can be executed by one or more processors as recited in claim 1" (Brewer Decl., Ex. B, at internal page no. 16) proves the opposite. The "computer program[s (i.e., modules)] that can be executed by one or more processors" in claim 1 perform many different, specific functions, which demonstrates that the "modules" amount to a generalized catch-all for whatever algorithms may perform the recited functions. *See, e.g., Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1372 (Fed. Cir. 2015) (applying Section 112, ¶ 6 because "the claims simply state that the 'compliance

mechanism' can perform various functions"); *Williamson*, 792 F.3d at 1350 (applying Section 112, ¶ 6 when the claim language "replaces the term 'means' with the term 'module' and recites three functions performed by the 'distributed learning control module'"); Christensen, ¶¶ 23-24.

In short, because each "module" limitation recites purely functional language without any definite structure, § 112(f) applies to these means-plus-function "module" limitations.

### 3. The '016 Specification Does Not Disclose Sufficient Corresponding Structure.

Because the "module" limitations are means-plus-function terms, the specification must disclose structure corresponding to the claimed functions. *Williamson*, 792 F.3d at 1351. Here, the '016 patent does not disclose any structure or algorithm to perform the claimed functions.

First, each "module" limitation explicitly recites the function for each "module" term:

| "Module" | Function |
|---|---|
| Call reception module | "receive incoming emergency voice calls being placed to an emergency call center through an emergency communications network from wireless mobile devices, the incoming emergency voice calls including a first voice call placed from a first wireless mobile device." |
| Outgoing message module | "generate outgoing textual messages for transmission to wireless mobile devices from which incoming emergency voice calls are received such that a first outgoing textual message is generated for transmission to the first wireless mobile device based on the first voice call." |
| Transmission module | "transmit the outgoing textual messages to the wireless mobile devices through a second communications network that is different than the emergency communications network such that the first outgoing textual message is transmitted to the first wireless mobile device through the second communications network." |
| Web-hosting module | "host web resources configured to query wireless mobile devices for location information; and share, responsive to receipt of location information, received location information with the presentation module." |

In each instance, the claim recites that a "module" is "configured to" perform the corresponding function. Therefore, in order for the claim to be definite, the specification must disclose corresponding structure for each function. *See, e.g., Williamson*, 792 F.3d at 1351-52 ("Where there are multiple claimed functions, as we have here, the patentee must disclose adequate

corresponding structure to perform all of the claimed functions.").

Second, the '016 Patent specification discloses no structure corresponding to these claimed functions. *Id*. at 1351 (second step of the means-plus-function analysis is to "determine what structure, if any, disclosed in the specification corresponds to the claimed function"). "[S]tructure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history *clearly links or associates that structure to the function recited in the claim*. This duty to link or associate structure in the specification to function is the quid pro quo for the convenience of employing § 112[(f)]." *B. Braun Medical, Inc. v. Abbott Laboratories*, 124 F.3d 1419, 1424, 43 U.S.P.Q.2d 1896 (Fed. Cir. 1997) (emphasis added).

When a claimed function is performed by a computer or processor, the corresponding structure is limited to the algorithm disclosed in the specification to carry out the claimed function. *WMS Gaming, Inc. v. International Game Technology*, 184 F.3d 1339, 1348 (Fed. Cir. 1999). That is, "[i]f the function is performed by a general-purpose computer or microprocessor, then the second step generally further requires that the specification disclose the algorithm that the computer performs to accomplish that function." *Rain Computing*, 989 F.3d at 1007. An algorithm is "a step-by-step procedure for accomplishing a given result." *Ergo Licensing, LLC*, 673 F.3d 1361(Fed. Cir. 2012) (citations omitted). The specification must disclose a specific algorithm for carrying out the claimed function and cannot merely recite the functional language of the claim. *Id.* Importantly, describing "the results of the operation of an unspecified algorithm" does not satisfy § 112(f). *Fintiv, Inc. v. PayPal Holdings, Inc.*, 134 F.4th 1377, 1385 (Fed. Cir. 2025).

The '016 discloses no structure (*e.g.*, an algorithm) to carry out any of the modules' claimed function. Christensen, ¶¶ 22-28. As noted above, to support with his § 112(f) conclusion, the Examiner cited to Fig. 1 and 4:64-9:30 (a sweeping citation containing nearly half of the "Detailed

Description").[7] Brewer Decl., Ex. A, at 11. The Examiner did not explain or analyze how these portions of the specification disclose sufficient structure for each recited function. Similarly, the Applicant in response to the Examiner's rejection cited swathes of the specification without any serious analysis of how these portions actual disclose any relevant structure corresponding to the claimed functions. Ex. B, at internal page nos. 18-26. A closer look shows that neither these various portions cited by the Examiner and the Applicant nor the '016 Specification as a whole disclose sufficient structure corresponding to the claimed functions.

Fig. 1 of the '016 Patent is illustrative: it is simply a high-level illustration of the entire system and provides no step-by-step procedures for carrying out any of the recited functions:



'016 Patent, Fig. 1. This does not connote structure. See, e.g., *Williamson*, 792 F.3d at 1351.

---

[7] The Examiner cites to U.S. Patent No. 9,301,117 ("the '117 patent") from which the '016 patent was reissued. For simplicity, citations are to the '016 patent. Fig. 1 and 4:64-9:30 of the '117 patent are identical to Fig. 1 and 5:17-9:60 of the '016 patent.

Elsewhere, the specification provides only high-level, functional descriptions of the "modules," and nowhere discloses sufficient structure corresponding to the claimed functions.

As an initial matter, as noted above, Claim 1 recites the use of a processor to execute the claimed "modules." This alone does not provide sufficient structure. A microprocessor or general purpose computer may be sufficient structure only where the claimed functionality is "coextensive" with a microprocessor or where the claimed functionality may be accomplished by a general-purpose computer may do without any special programming. *EON Corp. IP Holdings LLC v. AT&T Mobility LLC*, 785 F.3d 616, 621-22 (Fed. Cir. 2015) ('a microprocessor can serve as structure for a computer-implemented function only where the claimed function is 'coextensive' with a microprocessor itself"); *Ergo Licensing, LLC v. CareFusion 303*, Inc., 673 F.3d 1361, 1365 (Fed. Cir. 2012) ("a general-purpose computer is sufficient structure if the function of a term such as 'means for processing' requires no more than merely 'processing,' which any general-purpose computer may do without any special programming. If special programming is required for a general-purpose computer to perform the corresponding claimed function, then the default rule requiring disclosure of an algorithm applies."); *Ironworks Patents LLC v. Samsung Electronics Co., Ltd.*, 798 Fed. Appx. 621, 628-29 (Fed. Cir. 2020) ("The function of storing sub-identifiers 'requires more than merely plugging in a general-purpose computer.'"). As explained below, each module performs claimed functionality that extends beyond the basic functionality of "processing" such that special programming would be required to implement the claimed function. And as further explained below, the specification discloses no algorithm or other structure that corresponds to the claimed functions for each "module."

For the "call reception module," the '016 Patent discloses that "[t]he call reception module may be implemented, embedded, combined, and/or integrated with one or more emergency call

centers 15 to accomplish the functions attributed in this disclosure to call reception module 32."
'016 Patent, at 6:14-17. Elsewhere, the specification states that "the Call reception module 32 may
be configured to receive and/or monitor incoming emergency calls being placed to an emergency
call center 15." *Id.*, at 6:4-6. But this does not explain or disclose ***how*** the functionality of the call
reception module—"receive incoming emergency voice calls being placed to an emergency call
center through an emergency communications network from wireless mobile devices, the
incoming emergency voice calls including a first voice call placed from a first wireless mobile
device"—actually is accomplished, or what algorithm or structure is claimed to implement this
function. *Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1318 (Fed Cir. 2013) (the law is
"well settled that simply disclosing software [ ] without providing some detail about the means to
accomplish the function is not enough."); Christensen, ¶¶ 25-28. That the call reception module
"may be" implemented in some way with or within "one or more emergency call centers [] to
accomplish" the claimed functionality does not convey the structure necessary or sufficient to
implement such functionality. '016 Patent, at 6:4-6.

Similarly, the specification discloses no structure corresponding to the "outgoing message
module." Christensen, ¶¶ 25-28. In each case, the specification merely restates the functionality of
this "module": that it "may be configured to generate outgoing messages for transmission to
telephones and/or other devices," *id.*, at 6:26-28, or that it "may be configured to generate outgoing
messages for transmission in response to an abandoned emergency call," *id.*, at 6:49-52. But
merely restating the functionality the "outgoing message module" "does not set forth an algorithm
for performing the claimed functions."). *Williamson*, 792 F.3d at 1352-53.

Like the "outgoing message module," disclosures relevant to the "transmission module"
simply restate the associated functionality. For example, the specification discloses that

16

"[t]ransmission module 36 may be configured to transmit and/or receive messages, including but not limited to textual messages, incoming messages, outgoing messages, and/or combinations thereof. In some implementations, transmission module 36 may be configured to transmit outgoing textual messages through one or more networks 13." '016 Patent, at 7:6-11. While explaining that a message may be one of a non-limiting list of potential message types may imply that some specific format need be used for the messages (e.g., to be compatible with a cellular provider's network), there is no disclosure of any algorithm or other structure corresponding to how the "transmission module" itself performs the actual ***transmission*** or ***receipt*** of messages. Christensen, ¶¶ 25-28. All the patent says is that it does, and there is no disclosed structure a POSITA might recognize as actually accomplishing the claimed functions. *Id.*, ¶¶ 24-28; *see also Medical Instrumentation and Diagnostics v. Elekta*, 344 F.3d 1205, 1212 (Fed. Cir. 2003) (the inquiry is whether one of skill in the art would have understood the specification itself to disclose the structure, and not simply whether that person would be capable of implementing that structure).

Finally, the '016 Patent discloses no structure corresponding to the "web-hosting module" and instead just reiterates that it "may be configured to host a web-site, web page, web-application, mobile application, and/or other resources (jointly referred 45 to as 'web resources') that is accessible through the Internet and/or network 13." *Id.*, at 9:43-47. Again, this is not enough. Nowhere is any ***structure*** disclosed that might implement web-hosting. Christensen, ¶¶ 25-28. The closest we get is that "[i]n some implementations, web-hosting module 40 may be implemented by an external server, for example a third-party web-server." *Id.*, at 9:50-54. But a "web-server" or "external server" is simply a computer, and the claimed functionality—hosting web resources— is not the sort of functionality for which merely reciting a general purpose computer or processor is sufficient. *See, e.g., Ergo Licensing, LLC v. CareFusion 303*, Inc., 673 F.3d at 1365.

Courts have resoundingly held disclosure like this is insufficient to connote structure. *See, e.g.*, *Williamson*, 792 F.3d at 1351-52 ("The algorithm may be expressed as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure."). For example, in *Advanced Ground Information Systems, Inc. v. Life360, Inc.*, 830 F.3d 1341, 1349-50 (Fed. Cir. 2016), the Federal Circuit affirmed a finding of indefiniteness where the specification failed to disclose an algorithm for how the symbols were generated by the generator for the means-plus-function term "symbol generator." In the Court's words, "[a]lthough the specification of the '728 patent suggests that these symbols are generated via 'a map database and a database of geographically referenced fixed locations … with a specified latitude and longitude[,] … [and] [a] database with the constantly updated GPS location,' this only addresses the *medium* through which the symbols are generated. A patentee cannot claim a means for performing a specific function and subsequently disclose a 'general purpose computer as the structure designed to perform that function' because this 'amounts to pure functional claiming.'" *Id.* at 1349. Because the specification here discloses no algorithm or structure corresponding to the claimed functions, the "module" limitations amount to "pure functional claiming." *Id*.

In sum, nowhere does the '016 provide a step-by-step procedure, algorithm, or other structure sufficient to carry out the modules' functions. Accordingly, the "module" terms are indefinite because the specification discloses no corresponding structure. *Williamson*, 792 F.3d at 1354 (where a "patent fails to disclose any structure corresponding to the [claimed function of a means-plus-function claim]," claims "are invalid for indefiniteness under 35 U.S.C. § 112[f].").

C.    **"[sharing] … received location information with the user interface" / "[presenting] shared queried location information to emergency operators through the user interface." ('016 Patent, Claim 9)**

| Carbyne's Construction | CentralSquare's Construction |
|---|---|
| Indefinite. | Plain and ordinary meaning. |

Claim 9 recites a method in which location information is "presented" through the "user interface" and which location information is *also*, and ***separately***, "shared" with the "user interface." While it may be clear to a POSITA what "[presenting] shared queried location information to emergency operators through the user interface" means, "[sharing] … received location information with the user interface" appears to mean the same thing, and neither the intrinsic record nor extrinsic evidence informs a POSITA with reasonable certainty as to how they should be distinguished. The "[sharing] … received location information with the presentation module user interface" term is therefore indefinite in light of the "[presenting] shared queried location information to emergency operators through the user interface" term.

A POSITA would understand that a "user interface' is how a user and a system interact, including by showing information on a screen or display. Christensen, ¶ 30. The '016 Patent's specification supports this understanding. The specification explains that the presentation module may "may be configured to present, display, render, generate, and/or implement . . . user interfaces for users to interact with the system." '016 Patent, 4:10-13. The '016 Patent further explains that "a user interface may provide other ways for users to affect the presentation, including, but not limited to, textual input, touch screen gestures, pointer device input, and/or other ways for users to interact with a user interface." '016 Patent, 7:46-50. The specification describes various elements of an exemplary user interface, such as elements 602 and 603 which may be items that a user may interact with, such as a menu of user-selectable options. '016, 8:38-45.

A POSITA would further understand, consistent with the meaning of "user interface" and the text of the claims, that "presenting" information via that user interface would involve showing a user something on a screen or display. Christensen, ¶¶ 31-32. Originally, the text of Claim 9 recited for the "sharing" limitation, that "location information" was shared with the "***presentation***

*module*." Brewer Decl., Ex. D at Claim 9 (pre-amendment claims). Presumably, this meant information being sent to or "shared" with, the module from its source—the 911 caller who provides his or her location in response to a message from the 911 operator. During reexamination, however, the "sharing" limitation was amended such that the "location information" was "shared" not with the "presentation module" but with the "user interface" itself. *Compare* Brewer Decl., Ex. C, at 7 (Notice of Allowance) *with* Ex. D, at Claim 9 (pre-amendment claims).

As explained, the user interface is the means by which the user interacts with the system. As amended, Claim 9 recites "sharing, responsive to receipt of location information, received location information with the user interface" and "presenting shared queried location information to emergency operators through the user interface." *Id*. However, the specification does not explain how and whether these two limitations, "sharing … location information with the user interface" and "presenting shared queried location information … through the user interface" differ in any way. The specification has no disclosure regarding "sharing" with a user interface. The user interface's only function is to present information and receive input from the user. Sharing location information with the user interface would result in its presentation, as the user interface has no other relevant functionality. Ex. 1, ¶ 30-32. As such, it appears that the "sharing" limitation accomplishes the same function as the "presenting" limitation. Nor is there anything in the specification as a whole differentiates the "sharing" of location information with the user interface from the "presentation" of location information by the user interface. The result is that the "sharing" limitation in claim 9 "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 572 U.S. at 901; Christensen, ¶ 32.

## VI.    CONCLUSION

For the reasons discussed above, and those revealed through further discovery, the Court should adopt Carbyne's proposed claim constructions.

Dated:  October 13, 2025                  Respectfully Submitted

                                          */s/ Mark D. Siegmund*
                                          Mark D. Siegmund
                                          State Bar No. 24117055
                                          **CHERRY JOHNSON SIEGMUND JAMES PC**
                                          Bridgeview Center
                                          7901 Fish Pond Road, 2nd Floor
                                          Waco, Texas 76710
                                          Phone: (254) 732-2242
                                          Fax: (866) 627-3509
                                          msiegmund@cjsjlaw.com

                                          Alyssa Caridis
                                          **ORRICK, HERRINGTON & SUTCLIFFE LLP**
                                          355 S. Grand Ave
                                          Suite 2700
                                          Los Angeles, CA 90071
                                          Phone: (213) 612-2372
                                          Email: acaridis@orrick.com

                                          *Attorneys for Defendants*
                                          *CARBYNE, INC. and CARBYNE, LTD.*

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a true and correct copy of the foregoing document was served on counsel of record via the Court's electronic filing system on this 13th day of October 2025.

                                          */s/ Mark D. Siegmund*
                                          Mark D. Siegmund

21