**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

CENTRALSQUARE TECHNOLOGIES, LLC

Plaintiff and Counterclaim-Defendant,

v.

CARBYNE, INC. and CARBYNE LTD.,

Defendants and Counterclaim-Plaintiffs.

Civil Action No. 1:24-cv-01497-ADA

**JURY TRIAL DEMANDED**

**CENTRALSQUARE'S RESPONSE TO CARBYNE'S MOTION FOR JUDGMENT ON THE PLEADINGS FOR INVALIDITY UNDER 35 U.S.C. § 101**

# TABLE OF CONTENTS


**I. INTRODUCTION ..... 1**

**II. BACKGROUND ..... 2**

**III. LEGAL STANDARD ..... 3**

**IV. ARGUMENT ..... 4**

A. *Alice* Step One: The ’016 Patent Claims Are Not Directed to an Abstract Idea ..... 4

1. The ’016 Patent Was Directed to a Problem Resulting from Wireless Phone Ubiquity ..... 4

2. Carbyne’s Characterization of Claim 1 Is Inaccurate ..... 8

B. *Alice* Step Two: The Claims of the ’016 Patent Recite an Inventive Concept ..... 14

1. The ’016 Patent’s Individual Claimed Elements Are Inventive ..... 15

2. The Ordered Combination of the ’016 Patent’s Elements Is Inventive ..... 16

C. Carbyne’s Motion Should Be Denied as a Premature Motion for Summary Judgment ..... 19

**V. CONCLUSION ..... 20**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
882 F.3d 1121 (Fed. Cir. 2018)....................3, 19, 20

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
573 U.S. 208 (2014).................... *passim*

*AML IP, LLC v. J. C. Penney Corp. Inc.*,
21-cv-00522, 2022 WL 10757631 (W.D. Tex. Oct. 18, 2022).................... *passim*

*Ancora Techs., Inc. v. HTC Am., Inc.*,
908 F.3d 1343 (Fed. Cir. 2018)....................16

*Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed. Cir. 2016)....................17, 18

*Berkheimer v. HP Inc.*,
881 F.3d 1360 (Fed. Cir. 2018)....................18

*CardioNet, LLC v. InfoBionic, Inc.*,
955 F.3d 1358 (Fed. Cir. 2020)....................10, 11

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
927 F.3d 1306 (Fed. Cir. 2019)....................17

*Chaudhary v. Arthur J. Gallagher & Co.*,
832 F. App'x 829 (5th Cir. 2020) ....................3

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014)....................17

*Dewbre v. Horizon Mud Co., Inc.*,
No. 15-cv-00058, 2015 WL 13802810 (W.D. Tex. Nov. 2, 2015)....................4, 20

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016)....................9, 12

*FairWarning IP, LLC v. Iatric Sys., Inc.*,
839 F.3d 1089 (Fed. Cir. 2016)....................14

*Johnson v. Johnson*,
385 F.3d 503 (5th Cir. 2004) ....................3

*MCOM IP, LLC v. Woodforest Nat'l Bank*,
No. 21-cv-00989, 2022 WL 22870277 (W.D. Tex. Apr. 14, 2022) ........................................9

*McRO Inc. v. Bandai Namco Games America Inc.*,
837 F.3d 1299 (Fed. Cir. 2016)..............................................................................................4

*Mendoza v. Amarillo Indep. Sch. Dist.*,
No. 24-cv-00169, 2025 WL 1239906 (N.D. Tex. Apr. 29, 2025) ..........................................19

*Microsoft Corp. v. I4I P'ship*,
564 U.S. 91 (2011)..................................................................................................................3

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ..............................................................................................7

*Poindexter v. United States*,
777 F.2d 231 (5th Cir. 1985) ..................................................................................................5

*Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*,
827 F.3d 1042 (Fed. Cir. 2016)..............................................................................................6

*Salton v. Hillcoat Props., Inc.*,
No. SA-06-CA-504-XR, 2006 WL 8435382 (W.D. Tex. Nov. 15, 2006) ..........................3, 20

*Wildman v. Medtronic, Inc.*,
874 F.3d 862 (5th Cir. 2017) ..................................................................................................3

*Yondr, Inc. v. Be Smarter, LLC*,
2025 WL 4659255 (W.D. Tex. Dec. 8, 2025) ............................................................4, 16, 18

**Statutes**

35 U.S.C. § 103.......................................................................................................................2

44 U.S.C. § 1507.....................................................................................................................5

Administrative Procedure Act................................................................................................18

**Rules**

Fed. R. Civ. P. 12(d) ..........................................................................................3, 19, 20

Fed. R. Civ. P. 56(d) ..............................................................................................................4

Fed. R. Evid. 201 ..................................................................................................................19

Fed. R. Evid. 801 ..................................................................................................................19

Local Rule CV-5(a)................................................................................................................22

Rule 12(c)......3, 18

Rule 56......1, 3, 18

# I. INTRODUCTION

Faced with its failed IPR and certain infringement of CST's '016 Patent, Carbyne now—over a year-and-a-half after the case was filed, and more than a year after Carbyne filed an answer to the complaint—insists that CST's complaint should be dismissed under *Alice*, on the pleadings alone. Carbyne provides no justification for its delayed timing, or why this motion should be decided, let alone granted, at this stage. It should not, as Carbyne's motion suffers from multiple, fatal flaws including:

- At *Alice* Step One, Carbyne overlooks what the claim language actually recites as CST's invention and instead grossly generalizes the '016 Patent as merely relating to "communications with emergency callers." In reality, the innovations claimed in the '016 Patent solved a more recent and previously-unsolved technical and public safety problem (namely, emergency callers increasingly using wireless phones such that their location could not be reliably discerned or conveyed to a 911 center) with specific technical solutions, as expressly set out in the '016 claim language that Carbyne repeatedly ignores.

- Carbyne alleges that every claim covers only "communications with emergency callers" and thus they can all be evaluated together. But the claims may not be generically categorized that way; rather, they cover various specific innovations, including an API-based geolocation interface, a bidirectional transmission system, a call-abandonment detection system that enables a non-audio communications channel, and others. Courts (and Carbyne) are thus required to analyze each claim separately, but Carbyne offers no claim-specific analysis beyond the incorrect assertion that all claims are the same.

- At *Alice* Step Two, Carbyne offers only generic, unsupported attorney argument that there is nothing inventive about Claim 1. But the 19 challenged claims cover unique combinations of specific technologies that undisputedly improve the functioning of 911 dispatch systems at a technical level. The Patent Office expressly found that the unique technical arrangements set forth in the claims had never been disclosed in the prior art, which also strongly supports a finding that the claims are inventive. Carbyne ignores this evidence, which, at a minimum, raises disputed issues of fact compelling denial of the motion.

- Carbyne improperly relies on material outside the pleadings (namely, the Lipoff declaration), such that the motion must be denied as an unsupported motion for summary judgment. Carbyne claims that the Lipoff declaration is an undisputed "judicial fact," even though Carbyne itself disputes its contents. Carbyne's choice to depart from the pleadings renders its motion procedurally improper and means that Rule 56 applies, such that Carbyne's disputed factual claims all must be resolved in CST's favor, especially as fact discovery is ongoing and expert discovery has yet to begin.

## II. BACKGROUND

In 2022, CST briefly partnered with Carbyne, another provider of public safety software, which enabled CST to resell Carbyne's Apex and Universe products. Dkt. 1 ¶ 9. But Carbyne did not have a license to CST's intellectual property, including U.S. Pat. No. RE50,016 (the "'016 Patent"). *Id.* The partnership ended, but Carbyne now markets and sells its Apex and Universe products, which infringe the Asserted Claims of the '016 Patent. *See id.* ¶¶ 10, 37, 48–50.

Years ago, CST informed Carbyne that its products were practicing the claims of U.S. Patent No. 9,301,117 (the "'117 Patent") (the predecessor to the reissue '016 Patent). Dkt. 1, Ex. A at 1, 5. Carbyne claimed that no license was necessary because it did not infringe CST's '117 Patent, which it also claimed was invalid as obvious under 35 U.S.C. § 103. Dkt. 1, Exs. B, D, F. Notably, Carbyne never suggested the '117 Patent's claims were invalid under Section 101.

CST filed suit on December 4, 2024, Dkt. 1, and since then, Carbyne has engaged in a series of failed attempts to invalidate the '016 Patent. On February 19, 2026, the Patent Trial and Appeal Board (PTAB) *de-instituted* Carbyne's petition for *inter partes review*, challenging the '016 Patent. Ex. 1. Carbyne then tried to resurrect its IPR, but the Patent Office rejected those efforts too, in March of this year.[1] Ex. 2. Carbyne then argued to this Court that the "module" terms of the '016 Patent were indefinite (a position inconsistent with its statements to the Patent Office), Dkt. 29, but the Court rejected that challenge too at the April 2026 *Markman* hearing, Ex. 9 (2026-04-22 *Markman* Hrg. Tr.). Now, faced with no viable non-infringement positions, and over a year after Carbyne filed its Answer, Dkt. 18, Carbyne has turned to arguing that the '016 Patent is invalid under Section 101 based on the pleadings.

---

[1] Carbyne thereafter filed an *Ex Parte* Reexamination that was a carbon copy of its failed IPR. CST has not yet been afforded an opportunity to respond in that proceeding.

## III. LEGAL STANDARD

For 12(c) motions, the Court must "accept the complaint's well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004). "Pleadings should be construed liberally, and judgment on the pleadings is appropriate only if there are no disputed issues of fact and only questions of law remain." *Chaudhary v. Arthur J. Gallagher & Co.*, 832 F. App'x 829, 832 (5th Cir. 2020).

The question of eligibility may be determined at the pleadings stage "only when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018). And because patents are "presumptively valid," "to prevail, the movant needs to overcome both a factual deck stacked against it and a heightened burden of proof," *AML IP, LLC v. J. C. Penney Corp. Inc.*, 21-cv-00522, 2022 WL 10757631, at *3-4 (W.D. Tex. Oct. 18, 2022), and must prove invalidity by clear and convincing evidence. *Microsoft Corp. v. I4I P'ship*, 564 U.S. 91, 95 (2011).

Motions for judgment under Rule 12(c) are limited to the pleadings and facts subject to judicial notice. *Wildman v. Medtronic, Inc.*, 874 F.3d 862 (5th Cir. 2017). If on a motion under 12(c), "matters outside the pleadings are presented to and not excluded by the court,[2] the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *Salton v. Hillcoat Props., Inc.*, No. SA-06-CA-504-XR, 2006 WL 8435382, at *3 (W.D. Tex. Nov. 15, 2006) ("[I]f Defendants' motion is converted to a motion for summary judgment, it should be refused to permit Plaintiff to obtain depositions and additional discovery to respond to

[2] Even if the Court were to exclude Mr. Lipoff's declaration, Carbyne's motion should still be denied, as Carbyne will have conceded the primary basis for its assertions on inventiveness, *see* Dkt. 78 ("Mot.") at 14-17, and in light of CST's arguments presented herein.

the motion."); *Dewbre v. Horizon Mud Co., Inc.*, No. 15-cv-00058, 2015 WL 13802810, at *3 (W.D. Tex. Nov. 2, 2015) ("[T]he fact issues in this case should instead be resolved on summary judgment following a period of discovery."); *see* Cutri Decl. (setting out essential facts CST has been unable to obtain in discovery). A declaration from a party's counsel demonstrating with reasonable specificity how additional discovery is necessary to oppose the summary judgment motion is sufficient to defer considering the motion or deny it. *See* Fed. R. Civ. P. 56(d). In considering a summary judgment motion, all factual assertions must be construed against the movant. *Yondr, Inc. v. Be Smarter, LLC*, 2025 WL 4659255, at *1 (W.D. Tex. Dec. 8, 2025).

## IV. ARGUMENT

### A. *Alice* Step One: The '016 Patent Claims Are Not Directed to an Abstract Idea

*Alice* Step One begins by determining what the claims are "directed to," being "careful to avoid oversimplifying the claims." *McRO Inc. v. Bandai Namco Games America Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016). Carbyne fails to follow the Federal Circuit's guidance and ignores the relevant background of the invention and the claim language.

#### 1. The '016 Patent Was Directed to a Problem Resulting from Wireless Phone Ubiquity

As the specification and claims confirm, the '016 Patent is used in connection with wireless mobile devices. For decades before the '016 Patent was filed in August 2013, an emergency caller's location was obtained automatically from databases containing the addresses of landline phone numbers. Ex. 3 (*Technology Behind NG911 Caller Location Data: How 911 Locates Your Phone*, NGA911 BLOG (Mar. 26, 2026), https://nga911.com/blogs/post/technology-behind-ng911-caller-location-data-how-911-locates-your-phone) ("When someone dialed 911 from a landline, the phone number was automatically connected to a database containing the address associated with that phone line."). But by the time of the invention, the industry had begun to

confront a significant problem caused by increased wireless phone usage. As the FCC noted in a 2014 public report, between 1996 and 2012, the number of wireless phone users exploded, increasing tenfold to 326 million. Ex. 4 (*Wireless E911 Location Accuracy Requirements*, 79 Fed. Reg. 17820, 17823 (proposed Mar. 28, 2014) ("FCC Report")).[3] The number of wireless emergency calls also increased dramatically, such that by June 2013, almost three of four such calls were made by wireless phone. *Id.*

A significant public safety problem was created because, unlike landline calls, wireless calls could not be located by reference to a database. In particular, wireless calls, "pose[d] particular challenges for first responders in finding the caller," including because 80% of emergency calls were made indoors, "a city block in an urban environment could potentially contain thousands of apartments." *Id.* The FCC also concluded that there was "a market failure in the provision of E911 information for wireless calls," and that "requiring location information for wireless calls to 911 from indoors will result in significant public interest benefits, most importantly in 'promoting safety of life and property.'" *Id.*

CST arrived at the invention that led to the filing of the '016 Patent just as this problem emerged. Notably, while the FCC declared that the then-existing automatic address database system used with landlines needed to be replaced with a technology upgrade for wireless phones, it also believed that the potential options all had significant shortcomings requiring "substantial investment in both time and resources," such as "infrastructure development independent of the

[3] The FCC Report is published on the Federal Register and subject to judicial notice. 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed."); *Poindexter v. United States*, 777 F.2d 231, 236 (5th Cir. 1985) (noting district court was "*required* to take judicial notice" of material subject to 44 U.S.C. § 1507 (emphasis in original)).

wireless network," "development and maintenance of various databases to operate," and "cost implications in the handset . . . wireless network . . . [or] both." *Id.* at 17824.

But the specific technological architecture that CST invented solved these technical problems. And Carbyne's arguments to the contrary ignore the '016 Patent's claim language. First, the '016 Patent specifically required that the "outgoing textual message" would be transmitted "through a second communications network" with the emergency caller, *see, e.g.*, '016 Patent at Cls. 1, 9, which can leverage the cellular infrastructure and thereby avoid an expensive "infrastructure development independent of the wireless network." Ex. 4 at 17824. The use of text messages could not be undertaken in the era of landline emergency calls and reflects a "new and improved technique, for producing a tangible and useful result." *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1050 (Fed. Cir. 2016). The '016 Patent also specifically claimed a dual-channel architecture that allows voice calls to be placed through a first "emergency communications network," while the "outgoing text message" is transmitted "through a second communications network that is different than the" first network, '016 Patent at Cls. 1, 9, which created a mechanism whereby the voice call could continue on the first channel and avoid being unnecessarily burdened with data transmission of the outgoing textual messages. Claims 5 and 13 further require that the text messages will include "short message service (SMS) messages and/or multimedia messaging services (MMS) messages," *Id.* at Cls. 5, 13, technologies that only became useful for emergency calls after the marked rise in wireless phone usage.

The '016 Patent further specifically claims that the "first outgoing textual message includes a uniform resource locator (URL) link," *Id.* at Cl. 1, and not a link to a separate location app. This avoided any delay in the dispatching of emergency services waiting for a user to download an app or worse, trying to troubleshoot a malfunctioning app or incompatible operating system. Claims 1

and 8 further require that "web resources" are specifically configured to directly "query wireless mobile devices for location information," *id.* at Cls. 1, 8, including through the specific use of "an application programming interface (API) that accesses one or both of global positioning system (GPS) information and/or geolocation information," *id.* at Cls. 8, 14. This claimed innovation avoided the well-known problems associated with prior art strategies that depended on the location of the nearest cellular towers. Ex. 5 (DHS E911 Tech Note) at 2 ("The location of the cellular tower that the caller is connected to is provided as the caller's location. Depending on where the caller is in relation to the tower, this variation could be several feet or, in the worst case, several miles in a rural area."); Ex. 10 (Salafia)[4] at [0005] ("The accuracy of such a location may be dependent on the number of cell towers and signal strength."). Moreover, the ability to configure web resources to use an API to query a device directly for GPS information, '016 Patent at Cls. 8, 14*,* is a specific solution to locating a wireless device that did not exist (and was not necessary) in the landline era.

Additionally, the '016 Patent specifically claims a web-hosted module that would not only "query wireless mobile devices for location information," but that would then also "share, responsive to receipt of location information, received location information with the presentation module." *Id.* at Cls. 1, 9. This unique invention opened up additional technical possibilities, including a particular presentation module and user interface that displays to the emergency operator a caller's "historical information that is associated with one or more previous emergency voice calls," *id.* at Cls. 25-26, "received textual messages," *id.* at Cls. 6-7, 15-16, and information relating to "different types of emergencies," *id.* at Cls. 17-18. CST's unique web-based approach

---

[4] Salafia was cited during the prosecution of the '016 Patent, *see* Ex. 8 at 1, 5, 19-22, and thus is subject to judicial notice. *Phillips v. AWH Corp*., 415 F.3d 1303, 1317 (Fed. Cir. 2005).

also resulted in low upfront deployment costs (the millions of wireless phones already in use would not need any additional software) *and* low operational/maintenance costs (the web server could be conveniently and inexpensively maintained and updated).

The specific technological solutions claimed by the '016 Patent also solved well-known problems associated with then-existing solutions by providing *instantaneous* and highly accurate location information without relying on a caller's location knowledge or ability to speak. In "the absence of accurate location data associated with a wireless call, the caller must be questioned in detail to provide verbal information regarding their location. This process can be time consuming and callers are sometimes unable to speak or provide correct information." Ex. 4 at 17823. The '016 Patent's unique ability to instantly transmit accurate location information resulted in a substantial, tangible benefit: "on average, a one-minute decrease in ambulance response times reduced the likelihood of 90-day mortality from 6 percent to 5 percent, *i.e.,* a 17 percent reduction in the total number of deaths," such that "location accuracy improvements . . . could save approximately 10,120 lives annually." *Id.* at 17824. The invention claimed by the '016 Patent also allowed the transmission of text messages in response to calls that were "terminated prematurely, abruptly, before having been answered, or before an emergency operator has had adequate time to handle the emergency call," allowing operators to retrieve information from disconnected callers. '016 Patent at 2:63–66, 6:21-23, Cls. 21-22.

**2. Carbyne's Characterization of Claim 1 Is Inaccurate**

Against the facts set forth above (all of which must be construed in CST's favor), there is no question that Carbyne's Step One analysis of the '016 Patent is wrong because it oversimplifies and mischaracterizes the claims. As an initial matter, Carbyne limits its analysis to Claim 1, which is not representative of the dependent claims. As for Claim 1 itself, Carbyne's assertion that it is directed merely to "communicating with emergency callers," Mot. at 7, is at odds with the Federal

Circuit's admonition that "overgeneralizing claims, 'if carried to its extreme, make[s] all inventions unpatentable because all inventions can be reduced to underlying principles of nature which, once known, make their implementation obvious.'" *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016) (quotation omitted). Claim 1 is not directed to generally "communicating with emergency callers," but instead is directed to a specific technological solution that comprises a unique combination and architecture of technical elements that solved the new technological problems resulting from ubiquitous wireless phone usage. Carbyne's characterization of Claim 1 does not accurately capture the '016 Patent's claimed invention, but instead "impermissibly overgeneralizes the claims, characterizing them at too high a level of abstraction, [that is] 'untethered from the language of the claims.'" *MCOM IP, LLC v. Woodforest Nat'l Bank,* No. 21-cv-00989, 2022 WL 22870277, at *6 (W.D. Tex. Apr. 14, 2022) (quoting *Enfish*, 822 F.3d at 1337).

Carbyne further mischaracterizes the '016 Patent claims as "rely[ing] on generic computer technology to automate a longstanding practice of emergency operators" because "the idea amounts to an unpatentable process that could be, and long has been, performed by humans."[5] Mot. at 7-8, *see also id.* at 16. This is incorrect. First, as the FCC's statements at the time of the invention demonstrate, there was no accepted process for reliably and immediately locating wireless phones, Ex. 4 at 17823, much less one that had "long been performed by humans." Rather, there was a "market failure" to address the problem of locating wireless callers. *Id.* More fundamentally, Carbyne asserts that a human operator asking a caller for their location was a

5 Unlike the claims in *Alice*, which did not claim an improvement on existing technology, Mot. at 7, Claim 1 is directed to a specific technological improvement on emergency telecommunications technology requiring specific communication modalities, networks, and steps performed in a particular sequence.

longstanding practice for retrieving location information. However, "early emergency systems relied heavily on landline phones, which made location identification straightforward[:] . . . the phone number was automatically connected to a database containing the address associated with that phone line." Ex. 3 at 1. In fact, in prior art landline technology, the location was determined *before the call had been connected to the operator* "us[ing] selective call routing and reverse number lookup to route calls to the geographically appropriate PSAP without requiring a caller to state their location information." Ex. 5 at 1.

Contrary to Carbyne's assertions, location retrieval could not be readily or reliably accomplished by human conversation in the present context, for multiple reasons. For example, callers in emergency situations may be impaired, traumatized, or traveling, and thus unable to provide accurate location information. Ex. 4 at 17823. Additionally, as Carbyne has explained, for the "67 million people in America speak a language other than English at home . . . connect[ing with] a human translator . . . is time-consuming and can delay the dispatch of emergency services—and callers often drop off while waiting for a connection." Ex. 6 (Alex Dizengof, *Breaking Language Barriers in Emergency Calls: The Need for Immediate Language Identification and Translation*, Carbyne Blog, https://carbyne.com/blogs/breaking-language-barriers-in-emergency-calls-the-need-for-immediate-language-identification-and-translation (last visited July 9, 2026)) at 2. Thus, even before wireless phones, 911 services handling callers did not rely on speaking with a caller to provide their location and instead used a database lookup. *See* Ex. 3 at 1.

Carbyne's unsupported claim as to what the longstanding human practices were in the prior art mirrors what the Federal Circuit rejected in *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358 (Fed. Cir. 2020). There, the patent challenger argued that the claims, which involved collecting heartbeat variability data, were "drawn to automating basic diagnostic processes that doctors have

long used." *Id.* at 1370-71. The Federal Circuit disagreed, holding that the challenger failed to establish "that doctors performed the same techniques as the claimed device" and that it would be "difficult to fathom" how doctors could "mentally or manually" do so. *Id.* at 1371. The same is true here, as legacy 911 systems did not rely on operators to reliably and immediately obtain accurate caller location information.[6] Even if Carbyne had provided evidence as to whether human beings long performed location retrieval from callers as the standard practice,[7] that dispute would have to be resolved in CST's favor, such that Carbyne's Step One analysis would still fail. *See AML IP*, 2022 WL 10757631, at *7 (denying 12(b)(6) motion where there was "a disagreement as to claim 1's purpose and functionality").

Contrary to Carbyne's characterizations, the claims of the '016 Patent are similar to other claimed improvements the Federal Circuit has found to be patent eligible. In *Contour IP Holding LLC v. GoPro, Inc.*, the court held that the asserted claim was patent-eligible because it "require[d] specific, technological means . . . that in turn provide[d] a technological improvement to the real time viewing capabilities of a POV camera's recording on a remote device." 113 F.4th 1373, 1379

---

6 Carbyne agrees. *See* Ex. 7 (Axon, *Inside the Evolution of 911: Building a More Connected, Capable Communications System for Emergency Response*, Axon (Nov. 4, 2025), https://www.axon.com/blog/inside-the-evolution-of-911) at 2 ("[C]alling 911 . . . is the front door to public safety . . . [b]ut that thread was spun more than 50 years ago, for a world of rotary phones and fixed addresses. And it's fraying under modern pressure. The emergency communication systems that communities rely on today weren't built for smartphones . . . .").

7 Carbyne relies exclusively on the '016 Patent at 1:28-36 for its assertion that "gathering a caller's location is the dispatcher's age-old task," Mot. at 11, but that citation states only that operators "*may* gather and/or *attempt* to gather information during emergency calls, including but not limited to the name of the caller, the nature of emergency, the location of the emergency and/or the caller, and/*or* other emergency information." '016 Patent at 1:28-36 (emphasis added). The '016 Patent never says that location information was always or reliably collected by a human, but instead that a dispatcher might attempt to gather location information.

(Fed. Cir. 2024). Here too, the ’016 Patent utilizes “specific, technological means” (including using a second network to send a text message with a URL to query a mobile device’s real-time location) which provides a technological benefit of instant “real time viewing” of a device’s location “on a remote device,” *e.g.*, a dispatcher’s display. Similarly, in *Thales Visionix Inc. v. United States*, the Federal Circuit held the asserted claims were not abstract because they “provide[d] a method that eliminate[d] many ‘complications’ inherent in previous solutions for determining position and orientation of an object” using a “particular configuration” of sensors. 850 F.3d 1343, 1348 (Fed. Cir. 2017) (quotation omitted). Here too, the ’016 Patent claims describe a “particular configuration” of technology that “eliminates many ‘complications’ inherent in previous solutions for determining position” of emergency callers, by instantly and accurately determining a caller’s location when it is impossible to do so by landline database methods. *Id.*

Carbyne further mischaracterizes the claimed modules as abstract because they are purportedly implemented on “generic hardware” or “general-purpose computers.” Mot. at 6. But, even if the invention does run on a general-purpose computer, that does not “doom the claims” when the invention is more than “adding conventional computer components to well-known business practices.” *Enfish*, 822 F.3d at 1338. Here, the wireless device location technology in the claims of the ’016 Patent is distinct from the “long-standing commercial practice[s]” described in Carbyne’s cited cases, *see* Mot. at 7. Dkt. 1 ¶¶ 5, 8. Prior to the ’016 Patent, there was no accepted 911 technology for reliably and immediately locating wireless phones because early systems relied heavily on landline phones. *See supra* Section IV.A.1. The ’016 Patent took a radically different approach, using a second network connection to send a text message with an embedded URL capable of leveraging web servers to extract real-time location information directly from a caller’s mobile device. *See, e.g.*, ’016 Patent at Cl. 1. Carbyne also cites *Alice*, which held a “method of

exchanging financial obligations . . . using a third-party intermediary" to be a "fundamental economic practice long prevalent in our system of commerce." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 219 (2014). But here, given the prior use of database lookup, and the '016 Patent's new approach to the problems with that method, Carbyne has not come close to showing that Claim 1 replaced a fundamental human practice. That is because, as described above, the '016 Patent is an improvement to existing emergency telecommunications technology.

Recognizing that its characterization of Claim 1 is flawed, Carbyne later asserts that it is "directed to systems for gathering and presenting information." Mot. at 8. As an initial matter, the fact that Carbyne cannot consistently describe what Claim 1 is directed to dooms its Section 101 position. *See AML IP*, 2022 WL 10757631, at *7 (finding that the defendant failed to show that a patent is invalid where there were remaining factual disputes, including "a disagreement as to claim 1's purpose and functionality"). Nevertheless, Carbyne's cases are inapposite. First, in *Electric Power Group, LLC v. Alstom S.A.*, the court found the claims for gathering and presenting information were abstract because they did not advance "any particular assertedly inventive technology for performing those functions." 830 F.3d 1350, 1354 (Fed. Cir. 2016). Here, Claim 1 specifically articulates a unique combination of technology, including a specific technological solution that leverages text message, URL, and web resource technology, for locating an emergency caller's wireless mobile device.[8] Second, in *Bozeman Financial LLC v. Federal Reserve Bank of Atlanta*, the court held that claims about "receiving data from two financial records, storing that data, comparing that data, and displaying the results," were abstract because

---

[8] Carbyne's strawman arguments that the claims do not recite "new algorithm[s]," "novel protocols," a "synchronization mechanism" or any "network-layer technique," Mot. at 6, simply rehash Carbyne's indefiniteness positions that the Court has already rejected. *Cf.* Dkt. 29 at 20 ("[N]owhere does the '016 provide a step-by-step procedure, algorithm, or other structure sufficient to carry out the modules' functions.")

they exhibited a "fundamental business practice" implemented with "basic computer equipment." 955 F.3d 971, 978 (Fed. Cir. 2020). Here, Carbyne has not offered any evidence, let alone clear and convincing evidence, that Claim 1's language is directed to a "fundamental business practice." And Carbyne cannot because CST's innovative technology was unprecedented and solved various problems associated with the increased usage of wireless devices. Dkt. 1 ¶¶ 4-5, 8; *see supra* Section IV.A.1; *infra* Section IV.B. Third, in *Intellectual Ventures I LLC v. Erie Indemnity Co.*, the court held that claims directed toward "creation of an index used to search and retrieve information" using "XML-specific tags in the index without any further detail" were abstract. 850 F.3d 1315, 1327-28 (Fed. Cir. 2017). That is not the case here. Claim 1 provides substantially more technical detail for the claimed solution beyond simply "communicating with emergency callers," as Carbyne suggests. Mot. at 7. For example, Claim 1 sets out a channel used by the voice call and a communications network for text messages that contain a URL that links to a web resource that queries location information directly from the wireless device. Unlike *Electric Power Group*, *Bozeman*, and *Erie*, Claim 1 does not simply recite that information is gathered and presented, it instead articulates the specific technology and associated steps for *how* that information is technically obtained and *how* that communication is technically accomplished.[9] Claim 1 is thus not directed to an abstract idea, and Carbyne's motion should be denied.

### B. *Alice* Step Two: The Claims of the '016 Patent Recite an Inventive Concept

Even if the Court reaches *Alice* Step Two—which it need not do—Claim 1 of the '016 Patent contains an inventive concept and, thus, claims eligible subject matter. In conducting the

---

[9] Unlike *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1095 (Fed. Cir. 2016) where the "incorporation of a computer, not the claimed rule," improved the technological process, here the claimed specific sequence of communicating across voice, text, and web channels is what improved the then-existing technological process of using landline databases.

Step Two inquiry, courts must "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 573 U.S. at 217. Carbyne fails to do either.

**1. The '016 Patent's Individual Claimed Elements Are Inventive**

Carbyne fails to analyze the individual elements of each of the claims and ignores limitations in Claim 1, including those that require transmitting text messages through a second communications network, a text message that includes a URL link to web resources that query a mobile device for location information, and web resources that share location information with the presentation modules. Each limitation plays a critical role in solving the prior art's problems with accurately locating emergency callers using wireless phones. *See supra* Section IV.A.1. Carbyne also fails to consider the elements for the dependent claims, such as Claim 8's limitation that the web resources query a mobile device through an application programming interface that accesses GPS information or geolocation information. This inventive feature creates a direct interface between the mobile device and the web service, resulting in faster, more accurate location information with less resource usage. Dkt. 1 ¶¶ 4-5. Another example is Claim 22's improvement whereby a text message is automatically transmitted to the mobile device in response to an abandoned call, a problem that Carbyne itself acknowledges as a recurring outcome for emergency callers who are forced to wait for an operator. Ex. 6 at 1-2.

Finally, Carbyne's assertion that "the technology at issue in the claims is conventional" is unsupported attorney argument. Mot. at 12-13. Carbyne cites only the specification's description of the claimed invention, not to any evidence of conventional practices before the '016 Patent. *Id.* Even if Carbyne properly raised factual disputes about whether certain claim limitations were "conventional" (it did not), those disputes would compel denial of the motion, either as a disputed

fact in the context of a judgment on the pleadings or resolved in CST's favor under the summary judgment standard. *See AML IP*, 2022 WL 10757631, at *7; *Yondr*, 2025 WL 4659255, at *1.

**2. The Ordered Combination of the '016 Patent's Elements Is Inventive**

Carbyne also failed to consider the limitations of each claim "as an ordered combination." *Alice*, 573 U.S. at 217. The prosecution history confirms that the '016 Patent's ordered combination that sends a text message containing a URL connected to a web server which retrieves the location of a mobile device is novel and inventive. For example, during prosecution, the patentee distinguished prior art systems because they failed to disclose "query[ing] wireless mobile devices for location information," Ex. 8 ('016 File History) at 19-20, and thus further failed to disclose an "outgoing message module configured to generate textual messages . . . ***in combination with*** the first outgoing textual message includ[ing] a uniform resource locator (URL) . . . and web resources configured to (i) query wireless mobile device for location information." *Id*. at 20-21 (emphasis in original). Instead, prior art systems were limited to querying external databases, *id*. at 19-20, rather than receiving real-time information about a user's location directly from the wireless device placing the emergency call. The Patent Office agreed, finding that "[t]he prior art of record fail to anticipate or render obvious the limitation as cited ***in combination*** with other features in claims 1 and 9 where 'the first outgoing textual message includes a uniform resource locator (URL) link to the web resources'; 'querying, through web resources, wireless mobile devices for location information; sharing, responsive to receipt of location information, received location information with the presentation module.'" *Id*. at 25-26. The claims subsequently issued without further rejection. *See id*. at 24. The file history therefore "reinforces what the patent itself indicates": the ordered combination claimed by the '016 Patent is novel and inventive. *See, e.g.*, *Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1349 (Fed. Cir. 2018) (finding the

prosecution history "reinforced" the court's holding that claims directed to "a solution to a computer-functionality problem" were patent-eligible).

Indeed, "[i]mplementing a well-known technique with particular devices in a specific combination . . . can be inventive." *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1318 (Fed. Cir. 2019). In *Cellspin*, the Federal Circuit found that claims implementing Bluetooth and claiming a combination of steps that had not been previously implemented in a similar way were inventive. Likewise here, the '016 Patent's claims implement text messages containing URL links to web resources in a combination of steps to locate a mobile device and display that information to a dispatcher in a way that had not been done before. *See* '016 Patent at Cl. 1; Dkt. 1 ¶ 8. Similarly, in *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350-51 (Fed. Cir. 2016), the Federal Circuit held that the patent's "particular arrangement of elements is a technical improvement over prior art ways of filtering such content," and was thus patent-eligible. Here, too, the '016 Patent's particular steps for directly querying the location of a mobile device are a technical improvement over the prior art ways of locating an emergency caller through their landline phone number and associated address. And in *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1259 (Fed. Cir. 2014), the Federal Circuit held that a "specific way to automate the creation of a composite web page . . . to solve a problem faced by websites on the Internet" was inventive. Here, Claim 1 is a specific way to locate an emergency caller that solved the significant problems dispatchers and the public faced due to the rise in wireless phone usage.

Carbyne disagrees, asserting in a sole conclusory sentence that "there is nothing arguably unconventional about the claimed order here," which is wholly unsupported attorney argument.

*See* Mot. at 13.[10] But as discussed above, the '016 Patent's technology for using text messages to locate wireless phones was revolutionary at a time when emergency callers were located by associating their landline phone numbers with residential addresses. Indeed, never before had a system been designed using a second communications network to send a text message to a mobile device that contained a URL linked to a web resource that would then query the device's location and send that information back to the dispatcher. *See* Dkt. 1 ¶¶ 5, 8. But Carbyne does not present any evidence to dispute the inventiveness of this ordered combination. And even if it did, that factual dispute would warrant denial under Rule 12(c) or would be resolved in CST's favor under Rule 56. *See AML IP*, 2022 WL 10757631, at *7; *Yondr*, 2025 WL 4659255, at *1.

Carbyne's argument that CST's allegations of enhanced efficiency and accuracy cannot supply an inventive concept, Mot. at 17, misunderstands the law and the facts. Here, "the claimed improvement [of the '016 Patent] increases efficiency and computer functionality *over the prior art systems*," [*i.e.*, landline database systems] thereby yielding "an inventive feature." *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1369 (Fed. Cir. 2018) (emphasis added); *see also Bascom*, 827 F.3d at 1351 (making "prior art filter solution" "more dynamic and efficient" was patent eligible). CST's position is not simply that the claims locate an emergency caller in a faster way. Rather, the '016 Patent solves the problem of locating an emergency caller's mobile device because conventional technology of using a caller's landline-associated address was unreliable. The '016 Patent claims are thus like the claims in *CosmoKey Solutions GmbH & Co. KG v. Duo*

[10] Carbyne's cited cases are inapposite. In *In re Killian*, the applicant merely raised a series of facial challenges to the eligibility doctrine, including an arbitrary and capricious claim under the Administrative Procedure Act and lack of due process. 45 F.4th 1373, 1380-85 (Fed. Cir. 2022). In *BSG Tech. v. Buyseasons, Inc.*, the "only alleged unconventional feature . . . simply restate[d]" the abstract idea. 899 F.3d 1281, 1291 (Fed. Cir. 2018). Here, the inventive features and ordered combination of the '016 invention are more than the general abstract idea asserted by Carbyne, which is "communicating with emergency callers," Mot. at 7.

*Security LLC*, which "disclose[d] a technical solution to a security problem in networks and computers." 15 F.4th 1091, 1098 (Fed. Cir. 2021). Here, by allowing the caller's mobile device to "access, engage, interact with and/or activate the link, e.g. through execution of a browser software application" without the need for a pre-call database lookup or separate app, '016 Patent at 4:38-39, the '016 Patent claims "an improvement in the computer technology itself," which the Federal Circuit has repeatedly held to be patent eligible. *Aatrix*, 882 F.3d at 1127 (collecting cases).[11]

### C. Carbyne's Motion Should Be Denied as a Premature Motion for Summary Judgment

Carbyne's request is a motion for summary judgment as it relies on materials outside the pleadings. Fed. R. Civ. P. 12(d). Carbyne argues that because the Court adopted CST's construction of the "module" terms, CST's expert's declaration that supported its construction "is now law of the case" and is subject to judicial notice. Mot. at 4, n.1. Not so.[12] "The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."[13] Fed. R. Evid. 201(b). Here, Carbyne challenged Mr. Lipoff's opinions during the *Markman* hearing, *see*

---

[11] Accordingly, each of Carbyne's cases related to improved efficiency gains by performing human tasks on a computer are inapposite. Mot. at 17.

[12] That Mr. Lipoff's declaration was filed on the public docket does not mean that his opinions are "not subject to reasonable dispute" under Fed. R. Evid. 201(b). *See, e.g.*, *Mendoza v. Amarillo Indep. Sch. Dist.*, No. 24-cv-00169, 2025 WL 1239906, at *4-5 (N.D. Tex. Apr. 29, 2025) ("[F]acts alleged in the expert report are in dispute and are not an appropriate matter for judicial notice."). Mr. Lipoff's declaration is not "CST's own party admission," Mot. at 4, n.1, as he is not a party, and an opposing party's admission is relevant to admissibility, *see* Fed. R. Evid. 801, not judicial notice. That the Court agreed with CST's proposed construction of the term "module" does not mean it relied on Mr. Lipoff's expert opinion or that his *entire* declaration is somehow now an undisputed fact subject to judicial notice. *See* Fed. R. Evid. 201.

[13] Carbyne does not argue that Mr. Lipoff's opinions are "generally known." within the trial court's territorial jurisdiction." Fed. R. Evid. 201(b)(1).

Ex. 9 at 11:8–15, and *continues* to dispute his opinions that the "module" terms are not indefinite. *See* Mot. at 15, n.5 (maintaining that the "module" terms "would be indefinite").

Carbyne's motion must therefore "be treated as one for summary judgment," Fed. R. Civ. P. 12(d), and should be denied on the merits as unsupported by any admissible evidence (or as premature). At a minimum, CST "must be given a reasonable opportunity to present all the material that is pertinent to the motion," Fed. R. Civ. P. 12(d); *Salton*, 2006 WL 8435382, at *3 (denying summary judgment until after discovery); *Dewbre*, 2015 WL 13802810, at *3 (same), which would include a continuance to allow for written discovery, expert opinions, and documentary evidence, as CST requests here. *See* Cutri Decl. ¶¶ 20-22. *Salton v. Hillcoat Props., Inc.*, No. SA-06-CA-504-XR, 2006 WL 8435382, at *1 (W.D. Tex. Nov. 15, 2006) (denying 12(c) in light of non-movant's request to either deny or allow Plaintiff time for requested discovery); *see also Aatrix*, 882 F.3d at 1128 (Step Two is a question of fact and "in this case, [it] cannot be answered adversely to the patentee based on the sources properly considered on a motion to dismiss, such as the complaint, the patent, and materials subject to judicial notice.").

Even if Mr. Lipoff's declaration were subject to judicial notice (it is not), Carbyne's reliance on it is misplaced. Mr. Lipoff did not admit that the ordered combination of elements was conventional or well-known, but instead that a POSITA, reading the specification and claims would understand that the "modules" were not written in means-plus-function language, and that "the disputed 'module' terms in the '016 patent's claims would convey to a POSITA the structure required for performing the claimed functions." Dkt. 31-2 at 20-22. Absent from his declaration is any suggestion that any of the 19 asserted *claims* were themselves well-known or conventional.

## V. CONCLUSION

Carbyne's motion should therefore be denied.

Dated: July 10, 2026

Respectfully submitted,

*/s/Kat Li*

Kat Li
Texas State Bar No. 24070142
kat.li@kirkland.com
KIRKLAND & ELLIS LLP
401 W. 4th Street
Austin, TX 78701
Telephone: (512) 678-9100

Adam R. Alper (*pro hac vice*)
adam.alper@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400

Michael W. De Vries (*pro hac vice*)
michael.devries@kirkland.com
KIRKLAND & ELLIS LLP
695 Town Center Dr.
Costa Mesa, CA 92626
Telephone: (714) 982-8822

Gianni Cutri (*pro hac vice*)
gcutri@kirkland.com
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000

Lionel M. Lavenue (VA 49,005)
lionel.lavenue@finnegan.com
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER LLP
1875 Explorer Street, Suite 800
Reston, VA 20190-6023
Phone: (571) 203-2700

*Attorneys for Plaintiff CentralSquare Technologies, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was filed electronically in compliance with Local Rule CV-5(a). Therefore, this document was served on all counsel who are deemed to have consented to electronic service on July 10, 2026.

*/s/ Kat Li*
Kat Li